IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LINDSAY BALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO.: |
| | ) | 1:16-cv-00853 WKW-PWG |
| NATIONAL ENTERPRISE SYSTEMS, INC.; | ) | |
| NAVIENT SOLUTIONS, LLC; EQUIFAX | ) | |
| INFORMATION SERVICES,  LLC; EXPERIAN | ) | |
| INFORMATION SYSTEMS, INC.; and TRANS | ) | |
| UNION, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT NAVIENT SOLUTIONS, LLC'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON
PLAINTIFF'S AMENDED COMPLAINT**

## I.     INTRODUCTION

Plaintiff Lindsay Ball alleges NSL negligently or willfully violated the Fair

Credit Reporting Act ("FCRA") by not removing eight (8) student loans from her

credit report—all student loans disbursed for the benefit of her then-boyfriend

Andrew McLure when they were living together; Ball concedes she co-signed one

in 2009, but not the subsequent eight.  After years of receiving information in the

mail about the loans and telling NSL in 2014 she "wasn't sure" she signed the

other eight notes, in June 2015, Ball filed a report with the Sheriff's Office, and a

fraud claim with NSL—insisting she did not co-sign the last eight student loans. After speaking with Ball, reviewing its records and a Sheriff's report, NSL determined Ball was responsible for the loans, and that no fraud occurred.

Approximately a year later, in July 2016, NSL received disputes from consumer reporting agencies Experian, Equifax and Trans Union (the "CRAs") about each of the nine (9) loans (including the loan for which Ball admits responsibility), each of which failed to provide any information about Ball's dispute that NSL had not already reviewed as part of its own fraud investigation. As a result, NSL confirmed each loan as Ball's responsibility.  Discontent with the outcome, Ball subsequently filed this lawsuit, alleging FCRA violations by the CRAs, NSL, and collection agency National Enterprise Systems ("NES")—but not McLure, because she did not "think [she] would get anywhere by doing so."  (Ball Dep. 39:9-14)

Ball's FCRA claims must fail because NSL reasonably reinvestigated the disputes it received from the CRAs.   Furthermore, Ball cannot identify any damages caused by NSL's reinvestigation, nor any willful conduct to support her punitive damages claim.  NSL is entitled to summary judgment.

## II.    STATEMENT OF UNDISPUTED FACTS

### A.    Ball Co-Signs Student Loan for Boyfriend Andrew McLure

In August 2009, Ball's boyfriend Andrew McLure moved into her residence in Birmingham, Alabama.  (Ball Dep. 24:2-12)  Prior to September 2, 2009, Ball authorized McLure to sign her name as a cosigner on a Smart Option Student Loan, which occurred on September 2, 2009 ("Loan 1").  (Ball Dep. 44:10-22, Ex. 1)  Ball was aware McLure was seeking a student loan in the amount of $4,000, and that she would be jointly obligated with him to repay it.  (Ball Dep. 45:6-12)  Ball understood NSL was entitled to make reports to credit reporting agencies about whether she made payments, and that her credit would be impacted by any failure to make payments.  (Ball Dep. 49:14-23)  Ball did not want to see the correspondence or get the bills in the mail.  (Ball Dep. 46:7-10)  NSL serviced Loan 1.  (Bocanegra Dep. 19:1-4)

### B.    Ball's Name is Added as Co-Signer on Eight (8) Additional Student Loan Promissory Notes

NSL services an additional eight (8) Smart Option student loans disbursed for McLure's education at the University of Alabama, on which Ball is listed as a cosigner with signatures on the following dates:  September 29, 2009; October 6, 2009; January 12, 2010; May 4, 2010; June 9, 2010; August 19, 2010; September 28, 2010; and January 18, 2011, for an additional total principal amount of $37,200.00 ("Loans 2-9").  (Bocanegra Dec. ¶ 4, Ex. 1; Bocanegra Dep. 18:4-10,

19:1-7, 20:8-16, Ex. 2)  McLure lived with Ball continuously through these dates. (Ball Dep. 21:23-22:12, 23:10-18, 24:2-12)   Both McLure and Ball shared the responsibility of getting the mail at their various residences during this time period. (Ball Dep. 26:12-14)  NSL regularly sent mail to Ball about Loans 1-9 after 2009, and as additional loans were signed.  (Bocanegra Dec. ¶ 5)

Ball asked McLure about the loans before speaking to anyone else, at that time aware of nine (9) separate student loans in her name.  (Ball Dep. 31:9-17; 34:7-10)  When Ball first spoke to McLure about the student loans, she did not ask why her name was on the loans because she "didn't really care" but "just wanted payment of the loans."  (Ball Dep. 33:22-34:6)

On March 7, 2014, NSL called Ball in the course of servicing Loans 1-9. (Ball Dep. 51:18-52:15, Ex. 10; Bocanegra Dec. ¶ 6, Ex. 2)  Ball told NSL she would speak with McLure when he returned home, and NSL provided information about being removed from a loan as a cosigner.  (Ball Dep. 51:12-52:3, Ex. 10; Bocanegra Dec. ¶ 7, Ex. 2)  In approximately June or July 2014, Ball and McLure broke up, and McLure moved out of Ball's residence.  (Ball 20:16-21:11)

On July 8, 2014, Ball again spoke with NSL, and stated she was unable to pay, but would contact McLure to make payment.  (Bocanegra Dec. ¶ 8, Ex. 2).

On April 27, 2015, Ball called NSL and stated that she had little contact with McLure but the loans have "killed" her credit, and that McLure did not have

4

enough money for a cosigner release.  (Bocanegra Dec. ¶ 9, Ex. 2)  Ball asked NSL to send copies of her signature to her home, because she wanted to make sure he did not use her name after they broke up.  (Bocanegra Dec. ¶ 10, Ex. 2)

On May 7, 2015, Ball spoke with NSL and confirmed receipt of the promissory notes.  (Ball Dep. 54:1-55:2; Bocanegra Dec. ¶ 11, Ex. 2)  Ball stated "it was a long time ago but [she wasn't] sure [she] signed the promissory notes." (Ball Dep. 55:3-6; Bocanegra Dec. ¶ 12, Ex. 2)  Ball informed NSL that she "may" be claiming fraud, and that she and McLure were no longer together and she "definitely" did not sign for $50,000.  (Ball Dep. 54:1-55:2, Ex. 10; Bocanegra Dec. ¶ 13, Ex. 2)

### C.   In June 2015, Ball Files Fraud Claim with Sheriff and NSL

On June 2, 2015, Ball filed a report with the Shelby County Sheriff's Office, alleging McLure took out eight (8) student loans listing her as a cosigner, totaling $37,200, and with late fees, "about $50,000."  (Ball Dep. 58:22-59:3, Ex. 12)  Ball told the Sheriff's Office that she started receiving delinquency letters about the loans in March 2015.  (*Id.*)  The Sheriff's Office never asked Ball to provide any more information.  (Ball Dep. 64:12-14)

On June 9, 2015, Ball called NSL's Fraud Department and spoke with Sharon Wallace, a member of NSL's Fraud Investigation Team. (Bocanegra Dep. 35:9-24, Ex. 4; Ball Dep. 56:17-57:8, Ex. 11; Bocanegra Dec. ¶ 14, Ex. 3)  Ball

agreed that she cosigned Loan 1.  (Ball Dep. 57:4-12, Ex. 11; Bocanegra Dep. 39:24-41:16, Ex. 4; Bocanegra Dec. ¶ 15-19, Ex. 3)  Ball also stated she "found out" about the loans in March 2015 and called McLure, who stated he would try and make payments on time.  (*Id*.)  While speaking with Ball, Wallace reviewed a promissory note, and informed Ball that her social security number, date of birth, address and phone number matched the Accurint system information available to NSL.  (*Id*.)  Wallace also informed Ball that NSL had not received any returned mail, and that NSL's account notes showed that Ball was advised of the delinquency on March 7, 2014, June 26, 2014, and July 8, 2014, and that Ball had advised the representative that she would speak to McLure when he got home.  (*Id.*)  Wallace sent a fraud packet to Ball.  (*Id*.)  On June 18, 2015, NSL received the Shelby County Sheriff's Office report.  (Bocanegra Dep. 44:6-9, Ex. 4; Bocanegra Dec. ¶ 20, Ex. 3)  On July 17, 2015, Wallace conducted a final review of Ball's fraud claim, and closed the dispute based upon Ball's statements and NSL's account records, finding no identity theft.  (Bocanegra Dep. 45:8-18, 49:1-4; Bocanegra Dec. ¶ 21, Ex. 3)

### D.    Ball Provides Contradictory Information to NSL

Ball authorized her attorney Wilson F. Green, to send NSL a letter dated June 23, 2016 to "dispute certain items contained in her credit reports. . . ."  (Ball Dep. 68:14-17, Ex. 14, p. 3)  The letter referred to multiple adverse entries

regarding student loan accounts on Ball's credit reports, stating: "Ms. Ball never obtained any such student loans and never contractually obligated herself to any such student loan." (*Id.*) Ball is "unsure" why the letter does not reflect that she actually agreed to at least one of the student loans. (Ball Dep. 69:9-14)

### E.    In July 2016, NSL Responds to Disputes from CRAs

In July 2016, NSL received automated consumer dispute verifications ("ACDVs") from consumer reporting agencies Experian, Equifax and Trans Union (the "CRAs") relating to Loans 1-9, to which timely responses were provided. (Bocanegra Dec. ¶ 22, Ex. 5) Each of the disputes stated: "Claims true identity fraud, account fraudulently opened. Provide or confirm complete ID." (Bocanegra Dec. ¶ 23, Ex. 5) A copy of the Sheriff's Office report accompanied each ACDV. (Bocanegra Dec. ¶ 24, Ex. 5)

NSL's vendor, Advanced Call Center Technologies, LLC ("ACT"), processed the ACDV disputes electronically using the electronic Online Solution for Complete and Accurate Reporting ("e-OSCAR"). (Bocanegra Dec. ¶ 25) e-OSCAR is a web-based system designed to transfer information between CRAs and data furnishers, and to process ACDVs. (Bocanegra Dec. ¶ 26) ACT employees working on NSL ACDVs receive six (6) weeks of training, with annual compliance refresher training courses. (Bocanegra Dec. ¶ 27) Not only does ACT perform its own quality control ("QC") review of its ACDV responses, but NSL

performs QC reviews of ACT's ACDV processing.  (Bocanegra Dec. ¶ 28)  To conduct its investigation, ACT has access to NSL's account records, and ACT employees are trained to review and verify the information provided against NSL's system of record.  (Bocanegra Dep. 63:5-10; Bocanegra Dec. ¶ 29)  ACT employees check account records manually to respond to ACDVs.  (Bocanegra Dep. 79:10-12; Bocanegra Dec. ¶ 30)

For each ACDV, based upon the dispute code provided, ACT was required only to verify Ball's identification information.  (Bocanegra Dec. ¶ 31; Bocanegra Dep. 75:19-22, 79:23-80:1)  ACT reviewed Ball's last name, first name, address, social security number and date of birth against NSL's system of record in response to the CRAs' requests to "provide or confirm complete ID."  (Bocanegra Dec. ¶ 32; Bocanegra Dep. 75:15-76:15)  ACT verified the information provided against NSL's existing records, and reported any differences back to the CRAs.  (Bocanegra Dec. ¶ 33; Bocanegra Dep. 78:11-20, 83:25-84:5)  ACT also reviewed and considered the Sheriff's Office report attached to the ACDVs.  (Bocanegra Dec. ¶ 34, Ex. 5; Bocanegra Dep. 90:15-20; 91:15-20)  NSL's records reflect NSL had already received the Sheriff's Office report in the course of its own fraud investigation.  (Bocanegra Dep. 44:6-9, Ex. 4)  To each ACDV, ACT responded: "Completed investigation of FCRA dispute – consumer disagrees." (Bocanegra

Dec. ¶ 35)  NSL did not receive any other disputes from any CRA regarding Loans 1-9 prior to Ball filing this lawsuit on October 27, 2016.[1]  (Bocanegra Dec. ¶ 36)

### F.    Ball Files the Lawsuit

In Ball's original Complaint, she alleged she did not authorize <u>any</u> of Loans 1-9, but amended her complaint more than seven (7) months later on June 8, 2017 to admit responsibility for Loan 1.  (Docket No. 45)  Although Ball saw the original Complaint before it was filed, and knew that she was obligated on Loan 1, she is "unsure" why the original Complaint disclaims responsibility for <u>all</u> of the loans.  (Ball Dep. 72:10-73:6)

Ball has never made payments on Loans 1-9, and does not have plans to do so.  (Ball Dep. 32:2-6)  Ball has no plans to file a lawsuit against McLure because she does not "think [she] would get anywhere by doing so."  (Ball Dep. 39:9-14)  Despite admitting it would be the "easiest" and "most civil way," Ball has not pursued a resolution with McLure because "he has no job and where would he get the money to pay off these loans."  (Ball Dep. 128:11-129:13)

---

[1] NSL received numerous additional ACDVs after Plaintiff filed the instant lawsuit and thus they are not relevant to Plaintiff's claims.

### G.     Information Relating to Ball's Claimed Damages

#### 1.     Utilities

##### a.     Dothan Utilities

On or about August 6, 2014, Ball asked the utility company to place the utilities for her residence in her name instead of McLure's.  (Ball Dep. 89:5-18)  Based upon its use of the "On Line Utility Exchange," to determine Ball's risk of delinquency, Dothan Utilities required Ball to pay a "mid-level" deposit.  (Ball Dep., Ex. 19 at NAVIENT/Ball-000840)  Ball does not know what information the On Line Utility Exchange uses to determine whether or not a potential utility customer is a delinquency risk.  (Ball Dep. 91:6-10)

On or about October 27, 2015, Ball completed an application for utility service.  (Ball Dep. 90:7-23)  Based upon its use of the "On Line Utility Exchange," to determine Ball's risk of delinquency, Dothan Utilities required Ball to pay a "maximum" deposit of $500.  (Ball Dep. 90:7-23, Ex. 19 at NAVIENT/Ball-000845)  When Ball moved, she received a credit from Dothan Utilities for the deposit amount.  (Ball Dep. 91:1-5)

##### b.     Dixie Electric Cooperative

On or about December 9, 2016, Ball requested utility service from Dixie Electric Cooperative ("Dixie Electric") to her new residence at 818 Legends Drive, Montgomery, Alabama.  (Ball Dep. 92:14-21, Ex. 20 at NAVIENT/Ball-000828)

Based upon its use of the "On Line Utility Exchange," to determine Ball's risk of delinquency, Dixie Electric required Ball to pay a deposit of $340.  (Ball Dep. 90:7-23, Ex. 19 at NAVIENT/Ball-000827) Ball expects to receive her deposit back from Dixie Electric when she discontinues service at her current location. (Ball Dep. 94:8-12)

### c.      WOW!

Ball discontinued cable television service from WOW! as of the date of her deposition, but testified that she did not receive a deposit back and was not sure why.  (Ball Dep. 100:17-101:10)  Ball did not ask for a return of the deposit, and is not sure why she did not ask for it.  (Ball Dep. 101:11-14)

### d.      Charter Communications

Charter Communications ("Charter") is her current cable provider. (Ball Dep. 101:4-5)  Ball is not sure how much of the estimated $200-$300 deposit amount is attributed to WOW! or Charter.  (Ball Dep. 101:19-22)  According to Charter's records, Ball did not pay a deposit for cable television service from Charter.  (NAVIENT/Ball-001257-001259)

### 2.      Mortgage Loan

In September 2016, Ball applied for a home mortgage loan through InterLinc Mortgage Services, LLC to purchase the home she had been renting. (Ball Dep. 82:10-15, Ex. 18 at NAVIENT-Ball 880) Lisa Shockey with InterLinc

informed Ball that she could offer Ball the lowest rate available if Ball paid down her Capital One credit card balance, which was impacting her credit negatively. (Ball Dep. 83:1-84:4; 85:1-7) Ball was ultimately approved for a loan through InterLinc. (Ball Dep. 87:10-20, Ex. 18) However, Ball instead moved to a different location, paying $400 less in rent per month than she was willing to pay to purchase a home. (Ball Dep. 88:2-13)

### 3.   Rooms to Go Furniture

On November 25, 2015, Ball ordered furniture at Rooms to Go in Destin, Florida. (Ball Dep. 77:15-21, Ex. 17) Ball attempted to get approved for a loan on that date through Rooms to Go, and was denied after they "ran [her] credit." (Ball Dep. 76:11-16) Instead, Ball's parents paid for the furniture, and Ball pays them back without interest. (Ball Dep. 76:9-10; 78:8-79:7) Ball's parents are not charging her any fee to pay them back. (Ball Dep. 79:18-20)

### 4.   Car Loan

Ball does not have any reason to believe that the car loan she received is impacted by Loans 1-9. (Ball Dep. 94:20-95:11) Indeed, Ball was approved for a car loan by BB&T Dealer Finance on March 27, 2014. (Ball Dep. 104:8-15)

### 5.   Credit Limit

Ball admits her Capital One credit line was actually increased rather than decreased. (Ball Dep. 103:15-18)

### 6.   Emotional Distress

Ball experienced anxiety manifested in headaches, lack of sleep, anger and frustration beginning at the time she found about "the loans."  (Ball Dep. 95:12-96:10)  Ball has not sought a doctor's care and is not on any medications for such symptoms.  (Ball Dep. 135:16-136:9)  Ball is not sure if there is a way to identify what part of her frustration is NSL's fault, and attributes the "same anger, anxiety, lack of sleep, headaches" to NSL as she attributes to others.  (Ball Dep. 97:7-10; 153:7-12; 162:15-23)  Ball has no reason to think NSL employees did not do the best they could to investigate her credit dispute.  (Ball Dep. 97:11-18)  Ball has no evidence that NSL was trying to be malicious toward her.  (Ball Dep. 97:19-22)

### 7.   LifeLock Credit Protection

Ball purchased LifeLock credit protection in or around April 2016 "in order to watch my—what purchases were made on my behalf.  It was a protection." (Ball Dep. 105:9-13; NAVIENT/Ball-001265-001266)

## III.   <u>STANDARD OF REVIEW</u>

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986).  Pursuant to Federal Rule of Civil Procedure 56(c), a moving party shall be entitled to judgment in its favor if "there is no issue as to any material fact and . . . the moving party is entitled to judgment as a matter

of law." In deciding a motion for summary judgment, the court "must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986)).

To survive a motion for summary judgment, there must be evidence upon which the jury could reasonably find for the nonmoving party; a scintilla of evidence is not enough. *Anderson,* 477 U.S. at 252. If the entire record could not allow a rational fact finder to find in favor of the nonmoving party, then there is no genuine issue to be resolved at trial. *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV.   <u>NSL IS ENTITLED TO SUMMARY JUDGMENT</u>

### A.   NSL Reasonably Investigated the ACDVs.

"'Congress enacted [the] FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy.'" *Alston v. United Collections Bur., Inc.*, Case No. DKC 13-0913, 2014 WL 859013 (D. Md. Mar. 4, 2014) (quoting *Saunders v. Branch Banking & Trust Co. of Va*., 526 F.3d 142, 147 (4th Cir. 2008)). "FCRA creates a private right of action allowing injured consumers to recover actual damages caused by negligent

violations, and both actual and punitive damages for willful noncompliance." *Id.* (citing *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 239 (4th Cir. 2009)).

Section 1681s-2(b) of FCRA imposes various duties on companies that furnish information to CRAs ("furnishers"). 15 U.S.C. § 1681s-2(b)(1). Generally, section 1681s-2(b) requires a furnisher to "conduct an investigation as to the accuracy of information provided to a [CRA] upon receipt of notice from the CRA that the consumer disputes the debt." *Rollins v. Peoples Gas Light & Coke Co.*, 379 F. Supp. 2d. 964, 966 (N.D. Ill. 2005). A furnisher has no responsibility to investigate a credit dispute until after it receives notice from the CRA. *Alston*, 2014 WL 859013 (citing *Stafford v. Cross Country Bank*, 262 F. Supp. 2d 776, 784 (W.D. Ky. 2003)). Furnishers are liable under section 1681s-2(b) "only if they continue to supply inaccurate data to credit reporting agencies after proper notification by the CRA." *Rollins*, 379 F.Supp. 2d at 967.

Even if Ball could demonstrate that NSL provided an inaccurate response to the CRAs, "[m]ere proof of inaccuracy in a credit report will not suffice" to avoid summary judgment. *Tinsley v. TRW Inc.*, 879 F. Supp. 550, 552 (D. Md. 1995). Instead, "'reasonableness' is an appropriate touchstone for evaluating investigations under 1681s-2(b)." *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1302 (11th Cir. 2016). However, an investigation is not "'unreasonable'" simply because it "'results in a substantive conclusion unfavorable to the

consumer, even if that conclusion turns out to be inaccurate.'" *Boyd v. Wells Fargo Bank*, Case No. 2:15-CV-2, 2016 WL 7323293 at *6 (S.D. Ga. Dec. 14, 2016) (quoting *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1161 (9th Cir. 2009)).

*Boyd* provides the appropriate analytical framework for Ball's claims.  In *Boyd*, the plaintiff directly reported identity theft to Wells Fargo in 2008; Wells Fargo investigated and found Boyd responsible for the account balance.  *Boyd*, 2016 WL 7323293 at *1.  Approximately six years later, Wells Fargo received an ACDV from a CRA, claiming Boyd was not responsible for the account.  *Id.* at *2.  Wells Fargo reviewed and modified Boyd's date of birth, street address and compliance code, but did not remove the account from Boyd's credit file—Wells Fargo had already conducted an investigation.  *Id.* at *2, 7.  In reviewing Wells Fargo's actions under the "reasonableness" standard, the Court found:

> This was enough.  FCRA does not force furnishers to endlessly ride the reinvestigation merry-go-round.  To stop Wells Fargo from relying on the 2008 investigation, Boyd had to give it either "reason to doubt the veracity of the initial investigation" or "new information that would have prompted [it] to supplement the initial investigation."

*Id.* at *7 (quoting *Gorman*, 584 F.3d at 1160).  Because Boyd failed to provide new information or a reason to doubt the prior findings, Wells Fargo's "decision not to repeat a previously-conducted investigation <u>cannot</u> have been unreasonable."  *Id.* (emphasis in original).  The Court held Wells Fargo was entitled to summary

judgment on the FCRA claim, because its investigation was reasonable as a matter of law.  *Id.*

Ball can fare no better than Boyd, because she cannot genuinely dispute that NSL conducted a reasonable reinvestigation of the ACDVs.  ACT had access to NSL's records, but NSL received no information from the CRAs about Ball's disputes beyond the ACDVs (which was information it already had in its possession).  Here, ACT, NSL's ACDV processing vendor, reviewed each ACDV according to NSL's records (which includes the promissory notes, records of phone conversations and the fraud investigation, including the Sheriff's report) and reviewed and verified Ball's identifying information.

Ultimately, NSL's records showed a prior investigation and resolution of Ball's fraud claim, and ACT employees conducted a reasonable reinvestigation of the CRA disputes.  For Ball's FCRA claim, "[i]t would not have mattered even if [NSL's 2015 fraud investigation] had indeed turned out to have been inadequate, as far as the reasonability of the [2016 ACDV investigation] is concerned."  *Boyd*, 2016 WL 7323293 at *7.  Ball was required to alert NSL of the inadequacy of the earlier investigation at the time of the 2016 disputes, and she failed to do so.  *Id.* Even Ball's Complaint and Amended Complaint fail to provide new or different information, other than disagreeing with NSL's findings.  NSL is not required to ride the reinvestigation "merry-go-round," and is entitled to summary judgment.

**B.     NSL Did Not Damage Ball.**

However, Ball cannot ultimately even get to the question of whether NSL's investigation was reasonable, because NSL did not damage her.  Ball bears the burden of proving damages caused by a FCRA violation; "thus, the failure of an FCRA plaintiff 'to produce evidence of damage resulting from a FCRA violation mandates summary judgment.'"  *Rambarran v. Bank of Amer., N.A*., 609 F. Supp. 2d 1253, 1263 (S. D. Fla. 2009) (quoting *Nagle v. Experian Info. Solutions, Inc.*, 297 F.3d 1305, 1307 (11th Cir. 2002)).  Even if Ball could demonstrate that NSL violated § 1681s-2(b)(1), she is only entitled to damages for a negligent violation where she can demonstrate: "actual damages sustained by the consumer as a result" of a failure to conduct a reasonable reinvestigation of a dispute received from a CRA.  15 U.S.C. §1681o.  Ball claims that NSL caused:  (1) deposit payments to four (4) utility or cable companies; (2) denial of a mortgage; (3) denial of credit at Rooms to Go furniture store; (4) impact on a car loan; (5) reduction of her Capital One credit limit; (6) emotional distress; and (7) expense for LifeLock credit protection.

As in *Tinsley*, "Plaintiff's case similarly falters on the matter of damages; quite simply [s]he has shown none."  *Tinsley*, 879 F. Supp. at 552.  Here, for various reasons as set forth below, Ball cannot demonstrate that NSL caused her damages.  Without the requisite causal link, Ball cannot prevail on her FCRA

damages claim.  *See Perez v. TransUnion LLC*, 526 F. Supp. 2d 504, 512 (E.D. Pa. 2007).  In addition, her allegations of emotional distress do not meet the Eleventh Circuit's exacting standards, and are likewise inadequate to prevent summary judgment.

### a.   NSL Did Not Cause Ball's Alleged Damages.

### i.   Ball Cannot Recover for Injuries Occurring Prior to NSL's ACDV Response.

Ball cannot recover for injuries that occurred prior to the alleged FCRA violation—here, NSL's July 14, 2016 responses to the first ACDVs.  *See Rambarran*, 609 F. Supp. 2d at 1265.  From the outset, such standard eliminates Ball's claims for damages based on her deposits paid to Dothan Utilities and Dixie Electric, her denial of credit from Rooms to Go Furniture,[2] her car payment from BB&T, and her purchase of LifeLock credit protection[3].

Even though Ball testified that she paid a deposit to Dixie Electric around December 2016 (after NSL responded to the first ACDVs), when Dothan Utilities used the "On Line Utility Exchange" in October 2015, Ball had already reached the "maximum deposit" level.  (Ball Dep. 90:7-23, Ex. 19 at NAVIENT/Ball-

---

[2] Even if Ball's damage claim relating to Rooms to Go did not precede July 2016, she was not harmed by the alleged denial of credit, because she still received the furniture, and does not make any higher payments to her parents than she would have made to Rooms to Go.  (Ball Dep. 76:9-10; 78:8-79:20)

[3] Ball admitted she purchased LifeLock to watch what purchases were made on her behalf.  (Ball Dep. 105:9-13)  Even if she had not purchased LifeLock prior to the ACDVs, such "damage" could not be attributed to NSL (which did not make any purchases on Ball's behalf), but rather to McLure.

000845)   Therefore, NSL's later ACDV response did not further impact Ball's deposit status with Dixie Electric in December 2016.

### ii.      NSL Did Not Cause Damage Relating to Ball's Mortgage

Ball cannot demonstrate NSL caused her any damage relating to her mortgage application, as an initial matter, because she was ultimately approved for a loan.  (Ball Dep. 87:10-20)   In addition, Ball was instructed that she could receive a better credit score and the "best" interest rate if she paid down her Capital One credit card balance, which was impacting her credit negatively.  (Ball Dep. 83:1-84:4; 85:1-7, Ex. 18)  Therefore, Ball's <u>credit card balance</u> is the cause of any mortgage issue, since the NSL loans would have persisted either way.  Further, Ball ultimately decided to rent a home paying $400 less in rent than she was willing to pay for the mortgage.  (Ball Dep. 88:2-13)  Therefore, NSL did not damage Ball related to her mortgage application.

### iii.     Ball Concedes or Fails to Provide Admissible Evidence of Other Damages

During her deposition, Ball conceded her Capital One credit limit was actually increased, rather than decreased.  (Ball Dep. 103:15-18)  Charter also confirmed Ball did not pay a deposit for cable television service. (NAVIENT/Ball-001257-001259)  Ball's testimony regarding any deposit made to Charter or WOW! is vague, and insufficient to create a genuine issue of material fact as to

such deposit.  *See Rambarran*, 609 F. Supp. 2d at 1266 (summary judgment proper in FCRA case if factfinder would have to engage in speculation to award damages).

### b.      Ball's Emotional Distress Allegations Fall Short

Courts have warned that emotional distress damages under the FCRA are "fraught with vagueness and speculation" and "easily susceptible to fictitious and trivial claims."  *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 241 (4th Cir. 2009).  Ball's emotional distress falls readily into this category.  Ball claims she experienced anxiety manifested in headaches, lack of sleep, anger and frustration beginning at the time she found about "the loans."  (Ball Dep. 95:12-96:10)  From the outset, it is clear that Ball's alleged emotional distress was caused by <u>McLure</u>, not NSL's July 2016 ACDV responses.  Where Ball's alleged emotional distress is not readily tied to a "discrete breach of the FCRA," her "recitation of distressing economic hardships" she experienced from at least 2014 to the present is "too vague, too conclusory and too imprecise" to meet her burden.  *See Rambarran*, 609 F. Supp. 2d at 1268.  As noted by the *Rambarran* Court, a "factfinder would have to engage in impermissible speculation in order to create a causal link between Plaintiff's alleged emotional distress injuries" and the furnisher's "alleged failure to properly investigate its reporting of a charged off account . . . ."  *Id.* at 1269.  Here, Ball cannot even determine what damages were caused by which defendant's

alleged FCRA violations, much less tie any damage to a specific violation by NSL—when she claims she was experiencing the same emotional distress approximately two years before NSL even responded to the first ACDVs.

However, even if Ball did not fail to provide a causal link, her evidence fails to meet the rigorous standard for establishing emotional distress damages under the FCRA.   It is well-settled that a FCRA plaintiff may not rely upon her own testimony to support a claim for emotional distress damages.  *Rambarran*, 609 F. Supp. 2d at 1267; *see also Jordan v. Trans Union LLC*, No. 1:05 CV 305 GET, 2006 WL 1663324 at *7-8 (N.D. Ga. Jun. 12, 2006) (complaints of feeling "frustrated" and "degraded" cannot support mental anguish claim).  Here, Ball's reliance upon her unspecified claims of generalized distress to support this element of her damages cannot prevent summary judgment.

Finally, Ball's emotional distress damages cannot support her FCRA claim because she relies upon conclusory statements.  *See Rambarran*, 609 F. Supp. 2d at 1268 (citing *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 503 (4th Cir. 2007); *Wantz v. Experian Info. Solutions*, 386 F.3d 829, 834 (7th Cir. 2004); *see also Evers v. General Motors Corp.,* 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").  Therefore, Ball's claim fails.

### C.     Ball is Not Entitled to Punitive Damages.

To receive punitive damages under FCRA, Ball must demonstrate that NSL "willfully" failed to comply with a FCRA requirement.   *See* 15 U.S.C. § 1681n(a)(2).  Without a demonstration of willfulness by NSL, Ball is not entitled to punitive damages under FCRA.  *See Jordan v. Equifax Information Servs., LLC*, 549 F. Supp. 2d 1372, 1374 (N.D. Ga. 2008).  Ball admits she does not have any evidence NSL was trying to be malicious to her. (Ball Dep. 97:19-22)  Further, Ball cannot carry her burden of proving NSL recklessly disregarded her FCRA rights.  In this case, Ball disagreed with NSL's finding of no identity fraud—nothing more.  Almost a year before receiving the CRA disputes, NSL investigated Ball's fraud claim and found no merit, and received no new information from the CRAs a year later.  Given the series of misstatements by Ball in the course of her attempted disputes through the CRAs—claiming fraud even as to Loan 1 (when she knew she was responsible for that loan), claiming she first learned of the other loans in March 2015, when NSL's records showed multiple conversations about the loans in 2014, becoming suddenly emphatic that she did not owe Loans 2-9 when she "was not sure" in 2014—no reasonable factfinder could find even negligence by NSL in responding to the ACDVs, much less any willful or reckless behavior by NSL.

Ball can only rely on her assumptions about NSL's motives, which is unsupported speculation, and cannot defeat summary judgment.  *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (speculation does not create a genuine issue of fact to defeat summary judgment).  As such, punitive damages are inappropriate.

## V.    CONCLUSION

For all of the foregoing reasons, Defendant Navient Solutions, LLC, respectfully requests that the Court GRANT its Motion for Summary Judgment, that Plaintiff's Amended Complaint be dismissed with prejudice, with costs and all other proper relief.

Respectfully submitted,

*s/ Samantha K. Smith*
Samantha K. Smith (ASB-9045-H69S)
OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.
420 North 20th Street, Suite 1900
Birmingham, Alabama 35203
Telephone: 205-328-1900
samantha.smith@ogletreedeakins.com

*s/ Bonnie L. Martin*
Bonnie L. Martin (IN Bar No.20248-18)
OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.
111 Monument Circle, Suite 4600
Indianapolis, Indiana 46204
Telephone: (317) 916-1300
bonnie.martin@ogletreedeakins.com
*Attorneys for Defendant, Navient Solutions, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Wilson F. Green
FLEENOR & GREEN LLP
1657 McFarland Blvd. N., #G2A
Tuscaloosa, AL 35406
wgreen@fleenorgreen.com
*Counsel for Plaintiff*

W. Whitney Seals
PATE & COCHRUN LLP
Post Office Box 10448
Birmingham, Al 35202-0448
whitney@plc-law.com
*Counsel for Plaintiff*

Dustin J. Fowler
BUNTIN ETHEREDGE & FOWLER, LLC
185 North Oates Street
Post Office Box 1193
Dothan, Alabama 36303
Dustinjfowler@hotmail.com
*Counsel for Plaintiff*

Lee H. Copeland
Copeland, Franco, Screws & Gill, P.A.
444 S. Perry Street (36104)
Post Office Box 347
Montgomery, Alabama 36101-0347
Copeland@copelandfranco.com
*Counsel for National Enterprise Systems, Inc.*

*s/ Samantha K. Smith*
OF COUNSEL